# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CHARLES K. STALLARD,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00028 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,[1]** | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Charles K. Stallard, ("Stallard"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Stallard protectively filed his application for DIB on February 28, 2018, alleging disability as of July 1, 2010,[2] based on kidney stones; arthritis; peripheral artery disease, ("PAD"); high cholesterol; thyroid problems; anxiety; depression; vision problems; and neck, back and knee conditions. (Record, ("R."), at 12, 177-78, 204, 214.) The claim was denied initially and upon reconsideration. (R. at 98-100, 104-06, 109, 111-17.) Stallard then requested a hearing before an administrative law judge, ("ALJ"). (R. at 118-19.) The ALJ held a hearing on September 17, 2019, at which Stallard was represented by counsel. (R. at 36-73.)

By decision dated October 11, 2019, the ALJ denied Stallard's claim. (R. at 12-30.) The ALJ found Stallard met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2016.[3] (R. at 14.) The ALJ found Stallard had not engaged in substantial gainful activity from July 8, 2012, the amended alleged onset date, through June 30, 2016, the date last insured. (R. at 14.) The ALJ determined Stallard had severe impairments, namely peripheral vascular disease, ("PVD"); osteoporosis; osteoarthritis; emphysema; and history of right shoulder acromioclavicular, ("AC"), separation in 1999, but she found Stallard did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-19.)

---

[2] Stallard amended his onset date at his hearing to July 8, 2012. (R. at 72.)

[3] Therefore, Stallard must show he was disabled between July 8, 2012, the alleged onset date, and June 30, 2016, the date last insured, to be eligible for benefits.

The ALJ found Stallard had the residual functional capacity to perform medium[4] work, except he could lift or carry 50 pounds occasionally and 25 pounds frequently; stand, walk and/or sit for six hours in and eight-hour workday; occasionally balance, kneel, crawl, stoop, crouch and climb ramps or stairs; occasionally reach overhead with the right upper extremity; he must avoid concentrated exposure to hazardous machinery, temperature extremes, working at unprotected heights, working on vibrating surfaces and climbing ladders, ropes or scaffolds; and he has frequent near and far visual acuity with the right eye. (R. at 19-20.) The ALJ found Stallard was unable to perform his past relevant work as a diesel mechanic. (R. at 28.) Based on Stallard's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Stallard could perform, including the job of a production helper. (R. at 28-29.) Thus, the ALJ concluded Stallard was not under a disability as defined by the Act from July 8, 2012, through June 30, 2016, and he was not eligible for DIB benefits. (R. at 30.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued her decision, Stallard pursued his administrative appeals, (R. at 172-74), but the Appeals Council denied his request for review. (R. at 1-5.) Stallard then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Stallard's motion for summary judgment filed April 19, 2021, and the Commissioner's motion for summary judgment filed May 19, 2021.

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2020).

*II. Facts*

Stallard was born in 1957, (R. at 40, 177), which, at the time of his amended alleged onset date, classified him as a "person of advanced age" under 20 C.F.R. § 404.1563(e). He has a high school education and specialized training as a machinist. (R. at 40, 205.) Stallard has past work experience as a diesel mechanic, last working for a school system in 2010 as the lead mechanic. (R. at 41, 63, 205.) Stallard testified he left this job because he was in constant pain and "couldn't function anymore," stating his hands and arms would "lock up," and his knees were "going out from under [him]." (R. at 42.) He also stated he was of retirement age. (R. at 42.) Stallard testified he worked as a mechanic at a local shop in 2012 for seven weeks, but was unable to continue due to his hands, arms, shoulders, neck and legs giving out. (R. at 42-43.) He testified he was involved in an accident in 1999, during which his right shoulder was dislocated. (R. at 45, 51.) Some temporary restrictions on crawling were imposed, and he was placed on light duty, but he, eventually, was able to return to his mechanic job. (R. at 45.) However, Stallard testified his condition continued to worsen until he had to quit working in 2010. (R. at 59.) He testified he also had begun having left shoulder problems due to overcompensation. (R. at 45.) Stallard described his symptoms to include difficulty grasping with the right hand, a lack of right shoulder range of motion, numbness running down to the right hand, decreased grip, lack of strength, shaking, lack of feeling in his hands and cramping in both hands. (R. at 45-46, 55-57.) He stated he could not use his arms and hands for overhead activities, and he could use his hands for only a couple of minutes before they would go numb. (R. at 55-56.) Stallard testified he took Arthrotec for these conditions. (R. at 46.)

Stallard also testified he suffered from PVD, mostly in his legs, for which he took daily aspirin and cholesterol medication. (R. at 43.) He underwent diagnostic

testing as early as 2010 for leg circulation problems, and ultrasounds in 2010 and 2016 showed decreased blood supply in his legs. (R. at 51, 53.) Symptoms included pain, aching and burning in his feet, resulting in some balance issues and making it difficult to work on concrete. (R. at 52.) Stallard further testified he had arthritis in nearly every joint in his body, noting low back pain that radiated down both legs, mostly the right, that would cause his knees to sometimes give way. (R. at 52-53.) Stallard testified that knee x-rays from several years previously showed arthritis and joint damage. (R. at 52-53.) He stated that x-rays of his back, neck and hips showed nerve damage. (R. at 44-45.) Stallard testified he also suffered from a cranial nerve problem in his right eye, resulting in double vision if he looked down or to the right, and which began prior to his date last insured. (R. at 46, 48-50.) He stated he had experienced a nervous twitch in his left eye for 20 years. (R. at 49.) Stallard also testified he had been diagnosed with hypothyroidism, for which he took medication, but he had near constant fatigue. (R. at 61.) He stated he had lack of energy and "general lag" since 2012 or 2013. (R. at 61.) He further stated he had been diagnosed with emphysema, and he had difficulty breathing, but he had not undergone any testing. (R. at 47.)

Stallard estimated that, prior to his date last insured, he could walk for three or four minutes before having to stop due to leg pain and burning; he could stand for four or five minutes before having hip, back and neck pain, requiring him to shift his weight from one foot to the other; he could lift items weighing from three to five pounds; and he had to constantly shift in his seat when sitting. (R. at 43-44.) Stallard testified he could not work because he could not sit, stand, walk or see, making daily functioning difficult. (R. at 48.) He testified he spent his days "generally laying down" due to pain, but he had to change positions often, and he estimated he spent three to six hours lying down in an eight-hour period. (R. at 53-54.) Stallard testified he could not stoop, squat, bend and kneel off and on for 10 minutes out of every 30

minutes or one hour out of every three hours, noting if he squatted down, he could not get back up without pulling with his arms, which was difficult to do. (R. at 60-61.) Stallard testified he lived alone, he cooked and cleaned with help, he did his own laundry, and he continued to drive independently. (R. at 46-47.) However, he stated he had to take breaks while cleaning, and his girlfriend did his grocery shopping. (R. at 46-47.)

Barry Hensley, a vocational expert, also was present and testified at Stallard's hearing. (R. at 62-70.) He classified Stallard's past work as a diesel mechanic as heavy[5] and skilled. (R. at 63.) Hensley testified that a hypothetical individual of Stallard's age, education and work history, who had the residual functional capacity to perform medium work, except he could occasionally climb ramps and stairs, balance, kneel, crawl, stoop, crouch and reach overhead with the right upper extremity; who must avoid concentrated exposure to hazardous machinery, temperature extremes, work at unprotected heights, climbing ladders, ropes or scaffolds or working on vibrating surfaces; and who had frequent visual acuity, both near and far, with the right eye, could not perform Stallard's past work, but could perform other jobs existing in significant numbers in the national economy, including those of a brewery and distillery worker, an order selector or order picker and a production helper, all at the medium level of exertion. (R. at 63-64.) When asked to consider the same individual, but whose visual acuity in the right eye, both near and far, was occasional, Hensley testified the individual could perform no medium or light[6] exertional level jobs. (R. at 65-67.) Hensley next testified that the

---

[5] Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2020).

[6] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

same individual as in the first hypothetical, but who could lift and carry items weighing 20 pounds occasionally and 10 pounds frequently, could not perform Stallard's past relevant work, but could perform other jobs, including those of an inspector and hand packer, a storage facility rental clerk and an office helper.  (R. at 65, 67.)  He testified that an individual who could lift 15 pounds occasionally and up to five pounds frequently; stand and walk one to two hours total in an eight-hour workday, but for up to 30 minutes at a time; sit for six to seven hours in an eight-hour workday, but for up to one hour at a time; occasionally climb, stoop, balance and kneel; never crawl; and never work around heights, moving machinery or vibrating equipment could perform sedentary[7] work.  (R. at 68.)  Hensley testified that the individual in the first hypothetical, but who could use the right upper extremity for reaching, fingering, feeling and handling less than occasionally and the left upper extremity for the same activities occasionally could not perform any work.  (R. at 69.)  Next, he testified that an individual who would be off task 15 percent of the workday, could not perform any work and that no greater than two monthly absences is the maximum tolerable level.  (R. at 70.)

In rendering her decision, the ALJ reviewed records from Dr. Bert Spetzler, M.D., a state agency physician; Dr. Sreeja Kadakkal, M.D., a state agency physician; Dr. David Bristow, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Todd A. Cassel, M.D.; Clinch River Health Services, ("Clinch River"); Riverside Community Medical Center; Mountain View Regional Medical Center; The Health Wagon; Norton Community Hospital; Holston Valley

---

[7] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met.  *See* 20 C.F.R. § 404.1567(a) (2020).

Medical Center; Dr. S.C. Kotay, M.D.; St. Mary's Hospital; Dr. Robert Strang, M.D.; The Regional Rehab Center; and The Orthopedic Clinic.

The record shows that Stallard was involved in a motor vehicle accident on January 11, 1999, resulting in a complete separation of the AC joint of the right shoulder, which was surgically repaired by Dr. S.C. Kotay, M.D. (R. at 372-77.) An MRI, dated March 29, 1999, showed no evidence of a rotator cuff tear and expected post-surgical change in the right shoulder. (R. at 379.) Stallard underwent a short course of physical therapy, and he was released to light duty work on April 27, 1999, with temporary restrictions to pushing/pulling, working overhead, crawling and lifting with the right arm. (R. at 401-10.) However, on May 5, 1999, Stallard informed Dr. Kotay that he could not continue performing his job because his activities all were overhead. (R. at 412.) When Dr. Robert T. Strang, M.D., rendered a second opinion on May 10, 1999, he noted Stallard had tenderness over the right AC joint and stiffness, about 80 percent range of motion of the right shoulder and tenderness in the right rotator cuff area, but that MRI results showed no evidence of a rotator cuff lesion. (R. at 379, 383-84.) Dr. Strang diagnosed right shoulder pain in the AC joint and probable adhesive capsulitis. (R. at 384.) The following day, Dr. Kotay instructed Stallard to return to light duty work with the same temporary restrictions, and he ordered another course of physical therapy to increase his right shoulder range of motion. (R. at 386, 388-95.) By June 28, 1999, Stallard reported he felt he was ready to return to work, and it was noted he had met all his physical therapy goals. (R. at 395.)

On January 28, 2010, Stallard presented to Family Practice Riverside with complaints of right elbow pain, stiffness and swelling of three to four months' duration, as well as numbness and tingling in his feet and legs and that his feet stayed cold. (R. at 327.) Stallard reported he smoked one to one and one-half packs of

cigarettes daily.[8]  (R. at 327.)  He was diagnosed with right lateral epicondylitis, and testing was ordered on his legs.  (R. at 327.)  An arterial duplex scan of both lower extremities, dated February 4, 2010, showed scattered plaque on both sides, but no significant flow occlusion.  (R. at 329.)  Smoking cessation and a low-fat diet were strongly recommended.  (R. at 327.)

Stallard treated with Dr. Todd A. Cassel, M.D., from 2013 through 2019. During the period relevant to his disability claim, Stallard saw Dr. Cassel from October 10, 2013, through May 13, 2016.  (R. at 271-98.)  On October 10, 2013, he presented to Dr. Cassel to establish care as a new patient, stating he had not seen a doctor since about three years previously when he was checked for peripheral artery disease, ("PAD").[9]  (R. at 295.)  Stallard reported joint pain and some overuse injuries, as well as a little chest pain after exertion and coughing when arising due to sinus drainage.  (R. at 295.)  He also reported smoking at least 31 cigarettes daily and that he was not ready to quit.  (R. at 295.)  At that time, Stallard was taking only ibuprofen.  (R. at 296.)  On examination, he was alert and oriented; he had diminished breath sounds, but no wheezes, rales or rhonchi; he had no extremity edema, but pulses were slightly diminished; and neurologic exam was unremarkable, but he had a frequent spasm of the muscle around the left eye and left side of the face, which Stallard said had been present for a long time and was worsened by caffeine.  (R. at 296.)  Dr. Cassel diagnosed tobacco use and general osteoarthrosis. (R. at 296.)  He prescribed meloxicam and encouraged smoking cessation.  (R. at 296-98.)  When Stallard returned on April 10, 2014, he reported the meloxicam

---

[8] A chest x-ray, dated April 17, 2006, showed possible early chronic obstructive pulmonary disease, ("COPD").  (R. at 338.)  Emphysema is a type of COPD.  *See* https://www.medlineplus.gov/emphysema.html (last visited Jan. 10, 2022).

[9] PAD and PVD often are used interchangeably.  *See* https://www.heart.org/-/media/Files/Health-Topics/Peripheral-Artery-Disease/PVD-vs-PAD.pdf (last visited Jan. 10, 2022).

initially helped his arthritis, but no longer was doing so.  (R. at 291.)  He reported no new cardiovascular symptoms, and he stated his energy was "ok," but he reported a lot of aches, pains and soreness.  (R. at 291.)  On examination, he was alert and oriented; he had diminished breath sounds, but the lungs were clear, without wheezes, rales or rhonchi; there was no extremity edema; and peripheral pulses were intact.  (R. at 292.)  Dr. Cassel added hypothyroidism to Stallard's diagnoses, meloxicam was discontinued, and Celebrex was prescribed. (R. at 292-93.) On July 11, 2014, Dr. Cassel prescribed levothyroxine for Stallard's hypothyroidism.  (R. at 289.)   On September 11, 2014, Stallard told Dr. Cassel he continued to take meloxicam, as he could not afford Celebrex, and he continued to have arthritis and soreness.  (R. at 286.)  He, again, reported no new cardiovascular symptoms, he stated he was tolerating his medications, and he reported no acute changes.  (R. at 286.)  Stallard also reported he continued to smoke.  (R. at 286.)  He described his mood as good.  (R. at 287.)  On examination, he was alert and oriented; he had the same facial tic; lungs were clear, without wheezes, rales or rhonchi; there was no edema, redness or effusion of the joints; and peripheral pulses were intact.  (R. at 287.)   Dr. Cassel refilled Stallard's Celebrex and continued him on thyroid medication.  (R. at 287-88.)

On January 2, 2015, Stallard reported doing better on the Celebrex, stating he rarely was awakened by hip pain.  (R. at 282.)  Although he stated his energy had not been too good, he reported he had been "puttering around doing some hunting," which had resulted in some calf pain, but which had improved since the beginning of hunting season.  (R. at 282.)  Stallard continued to smoke.  (R. at 282.)  On examination, Stallard was alert and oriented; breath sounds were diminished, with some scattered, rare rhonchi, but no rales or wheezes; there was no extremity edema; and pulses were diminished bilaterally.  (R. at 283.)  Dr. Cassel added PVD to Stallard's diagnoses, and he counseled him on lifestyle modifications, including

smoking cessation, dieting and exercise. (R. at 283.) On May 8, 2015, Stallard complained of tenderness in the left ribs,[10] noting he injured this area previously in the fall. (R. at 279-80.) He noted he had been "working a lot of repairs and stretching again lately" when it started to hurt again. (R. at 280.) However, Stallard reported that Celebrex made a real difference for him. (R. at 281.) He described his mood as good. (R. at 280.) On examination, Stallard was alert and oriented; the lungs were clear, with no wheezes, rales or rhonchi; there was no extremity edema; and peripheral pulses were intact. (R. at 280.) His diagnoses remained unchanged, and Dr. Cassel continued to counsel him regarding lifestyle modifications. (R. at 280-81.)

On July 13, 2015, Dr. Cassel diagnosed hyperlipidemia, for which he prescribed simvastatin. (R. at 278.) However, when Stallard returned on November 13, 2015, he reported he stopped taking the cholesterol medication due to muscle and joint stiffness and pain, especially of the left shoulder. (R. at 275.) He stated this pain had improved since he discontinued the medication. (R. at 275.) Stallard reported he had been active "busting firewood" in the woods. (R. at 275.) He denied any breathing difficulty, and he had no cardiovascular complaints. (R. at 275.) However, Stallard continued to smoke. (R. at 275.) Stallard reported that social and family relations were "ok," and he had a good mood. (R. at 276.) On examination, he was alert and oriented; his lungs were clear without wheezes, rales or rhonchi; there was no extremity edema; the left shoulder was slightly tender posteriorly, but very painful and with limited internal rotation and abduction; rotator cuff strength was intact; and peripheral pulses were intact. (R. at 276.) Dr. Cassel added arthritis of the left shoulder region to Stallard's diagnoses, he advised him to continue

---

[10] Another part of the treatment note indicates it was the right rib area that was sore. (R. at 280.)

activities as tolerated and to stretch the left shoulder, and he continued to counsel Stallard on lifestyle modifications.  (R. at 276.)

On May 13, 2016, Stallard reported he was about the same, but stated he had a "rough winter [with] aches and sore[ness]."  (R. at 271.)  However, he reported he could raise his arm since discontinuing the cholesterol medication.  (R. at 271.)  Stallard continued to smoke.  (R. at 271.)  On examination, he was alert and oriented; he had a scaly rash on the right cheek; he had left eyelid paresis; the lungs were clear, without wheezes, rales or rhonchi, but he had diminished breath sounds; there was no extremity edema; and peripheral pulses were intact.  (R. at 272.)  Dr. Cassel added dermatitis to Stallard's diagnoses, for which he prescribed a course of mometasone furoate cream, he refilled his thyroid medication and counseled him in lifestyle modifications.  (R. at 272-73.)  This concludes Stallard's treatment with Dr. Cassel during the relevant time.  However, he continued to treat with Dr. Cassel after the expiration of his date last insured, through August 2019.

On November 14, 2016, nearly five months after his date last insured, Stallard returned to Dr. Cassel, reporting that his hypothyroidism was stable, he had no new cardiovascular symptoms, his claudication was stable, and he was tolerating his medications.  (R. at 268.)  He stated he had to "stop when climbing the mountain hunting for a few minutes," after which time, he could "go well again."  (R. at 268.)  Stallard continued to smoke up to 20 cigarettes daily.  (R. at 269.)  He reported some episodes of left foot pain, which resolved with a daily aspirin regimen for a week.  (R. at 269.)  On examination, Stallard was alert and oriented; he had no rash or skin lesions; he had a facial tic; lungs were clear, with some scattered rhonchi; there was no extremity edema; and he had decreased pulses.  (R. at 269.)  Dr. Cassel refilled Stallard's thyroid medication, and he counseled him on lifestyle modifications.  (R.

at 269.)  Dr. Cassel noted that Stallard's PVD would need to be reevaluated if the distance he could walk continued to lessen.  (R. at 270.)

On December 8, 2016, Stallard complained of bilateral knee pain and popping, left greater than right, after a hike.  (R. at 266.)  He also complained of medial swelling of the left knee and warmth on the left side, but he denied redness, knee locking or buckling / giving out.  (R. at 266.)  Stallard had full range of motion, but with discomfort.  (R. at 266.)  He denied depression.  (R. at 266.)  Stallard continued to smoke up to 20 cigarettes daily.  (R. at 266.)  On examination, he was alert and oriented; there was no erythema, no ecchymosis and mild swelling of the left proximal medial soft tissue of the knee; range of motion was decreased with left knee extension; there was moderate crepitus in the left knee; there was medial degenerative joint disease, left knee greater than right; the collateral ligaments were nontender, bilaterally; and McMurray's and Lachman's were negative.  (R. at 266-67.)  Dr. Gary E. Michael, M.D., another physician with Clinch River, diagnosed acute left knee pain and right knee pain, and he ordered bilateral knee x-rays.  (R. at 267.)    These x-rays showed moderate atherosclerotic arterial calcifications, bilaterally; bilateral, mild medial tibiofemoral compartment and patellofemoral compartment joint space narrowing; and no significant joint effusion.  (R. at 304-05.)  Pain injections were administered.  (R. at 267.)  On December 27, 2016, bilateral lower extremity pulse volume recordings, ("PVRs"), with exercise were suggestive of moderate stenosis in the arterial supply to each lower extremity, likely single site on each side.  (R. at 306.)  There was no evidence of exercise induced ischemia.  (R. at 306.)

On April 28, 2017, Stallard reported stable hypothyroidism, noting his energy was "ok," but he continued to report some aching with the weather, which ibuprofen was helping some.  (R. at 263.)  He reported no new cardiovascular symptoms, and

he stated he was tolerating his medications.  (R. at 263.)  Stallard advised Dr. Cassell he had "been out turkey hunting without troubles."  (R. at 263.)  He reported continuing to smoke up to 20 cigarettes daily.  (R. at 263.)  On examination, he was alert and oriented; lungs were clear, with no wheezes, rales or rhonchi; there was no extremity edema; and peripheral pulses were intact.  (R. at 264.)  Dr. Cassel refilled Stallard's thyroid medication, and he counseled him on lifestyle modifications.  (R. at 264-65.)  He opted to continue to monitor Stallard's PVD, and he advised him to exercise as best as he could and stretch for his generalized osteoarthrosis.  (R. at 265.)

Stallard saw Dr. Khalid J. Awan, M.D., an ophthalmologist, on February 23, 2018, for complaints of double vision of four days' duration.  (R. at 316.)  Dr. Awan diagnosed Stallard with sixth nerve palsy on the right; left blepharospasm; and borderline diabetes.  (R. at 316.)  He advised Stallard such palsy, which he thought might be related to diabetes, would usually clear on its own, and he recommended strict blood sugar control.  (R. at 316.)  Dr. Awan advised Stallard to obtain a referral to a neurologist from his primary care provider.  (R. at 316.)

When Stallard returned to Dr. Cassel on February 26, 2018, he reported his vision problems and that Dr. Awan had recommended a referral to a neurologist.  (R. at 259.)  Stallard continued to smoke up to 20 cigarettes daily.  (R. at 260.)  On examination, he was alert and oriented; lungs were clear, without wheezes, rales or rhonchi; there was no extremity edema; and peripheral pulses were intact.  (R. at 260.)  There was a twitch in the left eye, and the right eye did not move past the midline to the right, looking laterally.  (R. at 260.)  Cranial nerves II – XII were grossly intact, strength and sensation were normal, there were no cerebellar signs, and finger-to-nose testing was normal.  (R. at 260.)  Dr. Cassel added sixth cranial nerve palsy on the right, as well as hyperglycemia, to Stallard's diagnoses.  (R. at

260.)  He stated he would monitor the palsy, he ordered bloodwork to assess whether diabetes was an issue, and he discussed lifestyle modifications.  (R. at 261-62.)

On March 2, 2018, Stallard saw Teresa Tyson, F.N.P., a family nurse practitioner at The Health Wagon, with complaints of vision problems that started about 10 days previously, and for which an MRI had been scheduled.  (R. at 332.) Stallard reported his right eye had improved some since seeing Dr. Cassell on February 26.  (R. at 332.)  He reported continuing to smoke daily.  (R. at 333.)  On examination, Stallard's right pupil was slightly slower than the left, which was within normal limits; the lungs were clear; motor strength was normal in all extremities; sensory examination was intact, except Stallard could not turn the right eye laterally; and the remaining cranial nerves were unremarkable.  (R. at 333-34.) Tyson diagnosed sixth nerve palsy of the right eye, which appeared to be stable, she advised him to follow up with the MRI, and she instructed him to follow up if his symptoms persisted or worsened.  (R. at 334.)

On March 26, 2018, Stallard advised Dr. Cassel that his eye was no better, with continued double vision and a right gaze, but he denied any associated neurological symptoms.  (R. at 256.)  He continued to smoke up to 20 cigarettes daily.  (R. at 257.)   On examination, Stallard was alert and oriented; he had diminished breath sounds; and the right eye still did not cross the midline, moving laterally.  (R. at 258.)  Dr. Cassel added chronic rhinitis to Stallard's diagnoses, and he ordered an x-ray of the sinuses.  (R. at 258.)  These x-rays, dated March 27, 2018, were normal.  (R. at 309.)

Dr. Cassel completed an Assessment Of Ability To Do Work-Related Activities (Physical) of Stallard on March 30, 2018, finding he could lift and/or carry items weighing up to 15 pounds occasionally and from zero to five pounds

frequently.  (R. at 249-51.)  He found Stallard could stand/walk for a total of one to two hours in an eight-hour workday, but for 15 minutes to 30 minutes without interruption; he could sit for a total of six to seven hours in an eight-hour workday, but for 30 minutes to an hour without interruption; he could never crawl; he could never to occasionally kneel and crouch and occasionally climb, stoop and balance; his ability to see was affected by his impairment; he was restricted from working around heights, moving machinery and vibration; and he would be absent from work more than two days monthly.  (R. at 249-51.)  Dr. Cassel explained these restrictions were based on Cassel's arthritis in his knees; decreased blood flow to the legs; and right ocular nerve palsy, resulting in double vision.  (R. at 249-51.)

A May 8, 2018, MRI of Stallard's brain, showed no definite acute intracranial abnormality.  (R. at 310.)  When Stallard returned to Dr. Cassel on June 22, 2018, he reported stable hypothyroidism, no new cardiovascular symptoms and that he was tolerating his medications.  (R. at 253.)  He also reported no eye improvement, and he stated he had seen some "shimmering" in the left eye.  (R. at 253.)  Stallard continued to smoke up to 20 cigarettes daily.  (R. at 254.)  On examination, he was alert and oriented; lungs were clear, without wheezes, rales and rhonchi; there was no extremity edema; peripheral pulses were intact; and there was no change in the right sixth cranial nerve palsy, which Dr. Cassel noted was looking fairly permanent. (R. at 254-55.) He advised Stallard to remain as active as possible, and he counseled him on lifestyle modifications.  (R. at 255.)  On October 22, 2018, Stallard continued to report stable hypothyroidism, no new cardiovascular symptoms, that he was tolerating his medications and that his eye was about the same.  (R. at 363.)  He continued to smoke up to 20 cigarettes daily.  (R. at 364.)  Stallard's physical examination was unchanged, except he had diminished breath sounds.  (R. at 365.) Dr. Cassel continued to counsel Stallard on lifestyle modifications.  (R. at 365.)

On December 28, 2018, Stallard complained of increasing right shoulder pain without injury, noting it was difficult to turn his neck. (R. at 361.) He continued to smoke up to 20 cigarettes daily. (R. at 362.) On examination, the neck was slightly tender with movement, and there was tenderness to the trapezius muscle; the lungs were clear, but with diminished breath sounds; the right shoulder had some tenderness through the trapezius area and some over the subacromium; and right shoulder range of motion was limited in abduction and elevation. (R. at 362.) Dr. Cassel diagnosed right shoulder pain and tendonitis, noting the tendonitis should ease with conservative treatment. (R. at 362.) Stallard did not want an injection, and Dr. Cassel advised heat, massage and stretching. (R. at 362.) On February 22, 2019, Stallard continued to report stable hypothyroidism, no new cardiovascular symptoms, breathing "ok," no new injuries and tolerating his medications. (R. at 357-58.) He complained of continued right shoulder pain with tingling into the fingertips, stating it ached and hurt to sleep on it, and he could hardly raise it. (R. at 357-58.) A depression screening indicated moderate depression. (R. at 357.) Stallard continued to smoke up to 20 cigarettes daily. (R. at 358.) His examination was unchanged, except there was some tension in the trapezius muscle and some loss of shoulder elevation with pain. (R. at 359.) Dr. Cassel added cervical radiculopathy and carpal tunnel syndrome on the right to Stallard's diagnoses. (R. at 359.) He counseled him on lifestyle modifications, and he ordered right shoulder and cervical spine x-rays, which were performed that day. (R. at 359-60, 368-69.) The right shoulder x-rays showed an old, healed chip fracture, (R. at 369), and the cervical spine x-rays showed degenerative changes of the lower cervical spine. (R. at 368.)

A note from Dr. Cassel, dated May 20, 2019, stated it was his opinion, to a reasonable degree of medical probability, that the limitations contained in his March 30, 2018, physical assessment existed both before and after January 1, 2016, and

they continued to be present, with the exception of the ocular nerve palsy, which had an onset date of February 2018. (R. at 352.)  On May 23, 2019, Stallard returned to Dr. Cassel, reporting stable hypothyroidism, but decreased grip in the right arm with some pain, numbness and tingling. (R. at 355.)  He continued to smoke up to 20 cigarettes daily. (R. at 356.)  On examination, Stallard was alert and oriented; lungs were clear, with no wheezes, rales or rhonchi; there was no extremity edema; and peripheral pulses were intact. (R. at 355.)  Dr. Cassel noted that Stallard was at risk for diabetes mellitus, and he added bilateral carpal tunnel syndrome to his diagnoses. (R. at 356.)  He counseled Stallard on lifestyle modification, and he advised him to use splints overnight for a couple of weeks for the carpal tunnel. (R. at 356.)

On June 13, 2018, Dr. Bert Spetzler, M.D., a state agency physician, completed a physical evaluation in connection with Stallard's initial disability claim. (R. at 76-77.)  Dr. Spetzler noted that Stallard had provided no records for the period of 2010 to October 2013, and the records from 2013 to the date last insured did not include any gait or station, strength or range of motion findings, and there was no testing for his alleged vision issues. (R. at 76.)  For these reasons, Dr. Spetzler concluded there was insufficient evidence to fully evaluate Stallard's disability claim, and the evidence needed could not be obtained. (R. at 76, 79.)  Also on June 13, 2018, Dr. Sreeja Kadakkal, M.D., completed a Psychiatric Review Technique form, ("PRTF"), noting Stallard's allegations of anxiety and depression. (R. at 77.)  However, Dr. Kadakkal found there was insufficient evidence to evaluate Stallard's disability claim in this regard, as there was no mental medically determinable impairment present, and no mental status examination was on file. (R. at 77.)  All of this being the case, Dr. Spetzler concluded that Stallard's condition was not disabling on any date through his date last insured. (R. at 79.)

On August 15, 2018, Dr. David Bristow, M.D., another state agency physician, completed a physical evaluation of Stallard in connection with the reconsideration of his claim. (R. at 85-86.) He noted that, although Stallard had made additional allegations on reconsideration and provided some additional treatment notes, they were irrelevant to his date last insured. (R. at 85.) In particular, Dr. Bristow noted the October 10, 2013, treatment note indicated Stallard had not received medical treatment for more than three years. (R. at 86.) Also, he noted there were no scans prior to the date last insured to substantiate the severity of Stallard's physical diagnoses and no detailed neurological examinations prior to the date last insured or even within six months after that time. (R. at 86.) For these reasons, Dr. Bristow concluded there were insufficient medical records prior to June 30, 2016, to apply a residual functional capacity or a mental residual functional capacity finding. (R. at 86.) On the same day, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF, concluding that Stallard had no medically determinable mental health impairment and no mental health treatment prior to the date last insured. (R. at 86-87.) All of this being the case, Dr. Bristow concluded that Stallard's condition was not disabling on any date through the date last insured. (R. at 89.)

When Stallard saw Dr. Cassel on August 23, 2019, he reported stable hypothyroidism and hyperlipidemia, he denied any new cardiovascular symptoms, he stated he was tolerating his medications, and he denied depressive symptoms. (R. at 417.) He reported the same pain pattern and not doing too much. (R. at 417.) On examination, Stallard was alert and oriented; his eye nerve remained weak; the lungs were clear, with no wheezes, rales or rhonchi; he had no extremity edema; and he had diminished peripheral pulses. (R. at 417-18.) Stallard's diagnoses remained the same, and Dr. Cassel continued to counsel him regarding lifestyle modifications, including smoking cessation, exercise and diet. (R. at 418.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4ᵗʰ Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4ᵗʰ Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4ᵗʰ Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider

-20-

whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4ᵗʰ Cir. 1997).

Stallard argues the ALJ erred by improperly determining his residual functional capacity by rejecting Dr. Cassel's opinion, and, instead, substituted his opinion for that of trained medical professionals. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[11]

---

[11] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

Instead, an ALJ must consider and articulate how *persuasive* she finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[12] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After

---

[12] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

considering the relevant factors, the ALJ is not required to explain how she considered each of them. Instead, when articulating her finding about whether an opinion is persuasive, the ALJ need only explain how she considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

Stallard argues the ALJ erred by rejecting Dr. Cassel's March 30, 2018, opinion, in which he found Stallard could lift/carry items weighing up to 15 pounds occasionally and from zero to five pounds frequently; stand/walk for one to two hours total in an eight-hour workday, but for 15 to 30 minutes without interruption; sit for six to seven hours total in an eight-hour workday, but for 30 minutes to one hour without interruption; never crawl; never to occasionally kneel and crouch; occasionally climb, stoop and balance; and not work around heights, moving machinery and vibration. (R. at 249-51.) Dr. Cassel also opined Stallard's vision was affected by his impairment, and he would be absent from work more than two days monthly. (R. at 249-51.) The ALJ found Stallard had the residual functional capacity to perform medium work, except he could lift or carry 50 pounds occasionally and 25 pounds frequently; stand, walk and/or sit for six hours in and

eight-hour workday; occasionally balance, kneel, crawl, stoop, crouch and climb ramps or stairs; occasionally reach overhead with the right upper extremity; he must avoid concentrated exposure to hazardous machinery, working at unprotected heights, working on vibrating surfaces and climbing ladders, ropes or scaffolds; he must avoid concentrated exposure to extreme temperatures; and he has frequent near and far visual acuity with the right eye. (R. at 19-20.) A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2020).

In making her residual functional capacity finding, the ALJ found Dr. Cassel's opinion was neither consistent, supported nor persuasive because it was more restrictive than warranted by the medical evidence of record. (R. at 25.) The ALJ further noted that, although Dr. Cassell was Stallard's primary care provider during the relevant time, his physical examinations and treatment notes were not as severe as his 2018 assessment indicated. (R. at 26.) The ALJ correctly noted that Stallard did not develop nerve palsy until 2018, after the date last insured in 2016. (R. at 25, 316.) Although Stallard suffered a right shoulder AC separation in a 1999 motor vehicle accident, resulting in osteoarthritis, the ALJ correctly noted he was prescribed pain medication by Dr. Cassel during the relevant time. (R. at 25.) Likewise, the ALJ noted that Dr. Cassel treated the osteoarthritis in Stallard's knees with pain medication with some benefit. (R. at 26.) Specifically, on January 2, 2015, Stallard reported he was doing better on Celebrex, and by May 8, 2015, he stated Celebrex made a real difference for him. (R. at 281-82.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). The ALJ further correctly explained that physical examinations performed by Dr. Cassel showed Stallard's right shoulder and knees were sometimes tender with a mild decrease in range of motion, but Stallard had a normal gait, and he walked without any assistive device. (R. at 25-

26.)  These examinations also showed only slightly diminished pulses in the extremities.  (R. at 26.)  Despite showing symptoms of PVD in both legs in 2010, which caused difficulty walking long distances, the ALJ noted that Dr. Cassell treated Stallard conservatively with cardiac medications and recommended lifestyle modifications.  (R. at 26.)

As for Stallard's breathing issues, while he sometimes experienced wheezing due to emphysema, Dr. Cassel's examinations generally revealed only some diminished breath sounds and some scattered, rare rhonchi.  (R. at 26.)  The court further notes that, despite Dr. Cassel's recommendations at every appointment to quit smoking, Stallard never did.  Although Dr. Cassel provided a May 20, 2019, opinion, in an effort to show that Stallard's conditions and associated limitations as set forth in his March 30, 2018, assessment existed during the relevant time, with the exception of the ocular nerve palsy, for the reasons already stated, substantial evidence supports the ALJ's finding that Dr. Cassel's 2018 opinion was neither consistent with nor supported by the evidence of record, including Dr. Cassel's own treatment notes.

The ALJ found the opinions of the state agency physicians, Drs. Bristow and Spetzler, not persuasive because they did not provide a residual functional capacity.  (R. at 22-23, 76-77, 85-86.)  Specifically, Dr. Bristow and Dr. Spetzler both concluded there was insufficient evidence to evaluate Stallard's claim prior to the date last insured.  (R. at 22, 76, 79, 86, 89.)  The ALJ further noted that Drs. Bristow and Spetzler did not regularly treat Stallard, and they did not have access to the 2019 hearing testimony.  (R. at 23.)  Likewise, the ALJ found the opinions of the state agency psychologists, Leizer and Dr. Kadakkal, not persuasive because they did not provide a residual functional capacity, they did not regularly treat Stallard, and they did not have access to the 2019 hearing testimony.  (R. at 23, 77, 87.)  As with the

state agency physicians, Leizer[13] concluded there was insufficient evidence to evaluate Stallard's claim prior the date last insured.  (R. at 23, 87.)   The ALJ correctly noted that, despite Stallard's allegations of depression and anxiety during the relevant time, mental health screenings by Dr. Cassel revealed no mental health issues, Stallard was not prescribed any psychiatric medications, he attended no counseling sessions, he had no voluntary or involuntary psychiatric admissions, and mental status examinations generally were normal.  (R. at 23.)  The record shows that Stallard consistently was described as alert and oriented during the relevant time. (R. at 272, 276, 280, 283, 287, 292, 296.)  Moreover, in November 2015, he reported that social and family relations were "ok."  (R. at 276.)  In September 2014 and May and November 2015, Stallard described his mood as "good."  (R. at 276, 280, 287.)

Next, contrary to Stallard's argument, I find that ALJ did not improperly substitute her opinion for that of trained medical professionals in formulating Stallard's residual functional capacity. Instead, she considered the evidence related to Stallard's impairments before arriving at such a finding. The ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining a claimant's residual functional capacity. Instead, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2020); *see also* 20 C.F.R. § 404.1527(d)(2) (2020) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner).

---

[13] Dr. Kadakkal did not specifically state there was insufficient evidence to evaluate Stallard's claim during the time relevant to his claim.  Instead, Dr. Kadakkal simply found the evidence failed to establish a mental medically determinable impairment during such time.  (R. at 77.)

As the ALJ explained in her decision, the residual functional capacity finding was supported by the evidence showing that treatment for Stallard's allegedly disabling impairments was essentially routine and conservative in nature. (R. at 27.) For instance, his right shoulder osteoarthritis, as well as his bilateral knee osteoarthritis, were treated by Dr. Cassel with pain medications with some benefit. (R. at 27.) His bilateral PVD, beginning in 2010, which resulted in alleged difficulty walking long distances, was treated only with cardiac medications and repeated suggested lifestyle modifications by Dr. Cassel. (R. at 27.) No medications were prescribed for Stallard's wheezing due to emphysema. (R. at 27.) Additionally, the record reveals that Stallard did not have any emergency department visits, hospitalizations, physical therapy, injections or surgical recommendations related to any of his allegedly disabling impairments during the relevant time. (R. at 27.) Instead, he saw Dr. Cassel approximately every four to six months during the period relevant to his claim. (R. at 27.) The ALJ also correctly noted that her residual functional capacity finding was supported by Dr. Cassel's physical examination findings, which, generally, were benign, except for some diminished breath sounds and some scattered, rare rhonchi; and occasional tenderness in the right shoulder and knees with mildly decreased range of motion. (R. at 27.) Otherwise, Stallard regularly had a normal gait, and he did not use an assistive device. (R. at 27.) Next, the ALJ correctly noted in her decision that Stallard's reported activities were inconsistent with his allegations of disabling impairments. (R. at 27.) Specifically, in January 2015, he stated he had been hunting; in November 2015, he stated he had been "busting firewood" in the woods; in November 2016, he reported climbing a mountain while on a hunting trip; and in April 2017, he reported he had been turkey hunting without any trouble. (R. at 27.) The ALJ further noted that the record showed that Stallard went for long periods of time with no or little medical care, which does not support a finding of disability. (R. at 27.) For instance, when he established care with Dr. Cassel in October 2013, he stated he had not seen a doctor

in about three years. (R. at 27.) As stated above, thereafter, he saw Dr. Cassel for routine follow-up visits about every four to six months. (R. at 27.) Finally, the ALJ noted that Stallard had complained of right shoulder issues, osteoarthritis, PVD and emphysema for many years prior to the amended alleged onset date, including periods of time while he worked the heavy exertional job of a mechanic. (R. at 28.) For instance, the ALJ noted that, while Stallard initially injured his right shoulder in 1999, he was able to return to work for more than 10 years before retiring in 2010. (R. at 28.) Likewise, a chest x-ray showed emphysema as early as 2006. (R. at 28.) Additionally, an arterial duplex scan of Stallard's legs showed scattered plaque on both sides in 2010. (R. at 28.) Nonetheless, the ALJ explained that the objective signs and Stallard's subjective complaints to treating medical professionals did not show that these impairments became notably worse since the amended alleged onset date in 2012, suggesting that Stallard's impairments did not prevent him from working. (R. at 28.) By discussing and relying on all the above evidence, I find that the ALJ "buil[t] an accurate and logical bridge from the evidence to his conclusion[s]" about Stallard's residual functional capacity that permits meaningful judicial review. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

For all the above-stated reasons, I find substantial evidence exists to support the ALJ's consideration of the opinion evidence, as well as her residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Stallard was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Stallard's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      January 10, 2022.

*/s/ Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE